## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| BOARD OF TRUSTEES OF THE MAINE CREDIT UNION LEAGUE INSURANCE TRUST, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | |
| ANTHEM HEALTH PLANS OF MAINE, INC., D/B/A ANTHEM BLUE CROSS & BLUE SHIELD, | ) ) ) ) | |
| Defendant. | ) | |

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiff the Board of Trustees of the Maine Credit Union League Insurance Trust ("MCULIT"), by and through its undersigned attorneys, complains against Anthem Health Plans of Maine, Inc., d/b/a Anthem Blue Cross & Blue Shield ("Anthem"), as follows:

### <u>The Parties</u>

1.      MCULIT is a self-insured multiple-employer welfare arrangement ("MEWA") incorporated and formed in the state of Maine.

2.      MCULIT also is an Association Health Plan and a Voluntary Employee Benefits Association under applicable federal and state law.

3.      MCULIT is governed and managed by its Board of Trustees.

4.      Upon information and belief, Anthem is a Maine corporation with a principal place of business in South Portland, Maine.

### <u>Jury Trial Demand</u>

**5.**      MCULIT demands trial by jury on all issues triable by a jury.

1

**Jurisdiction and Venue**

6.     MCULIT brings this Complaint under federal question jurisdiction pursuant to 28 U.S.C. § 1331.

7.     The Court has supplemental jurisdiction regarding MCULIT's state-law claims pursuant to 28 U.S.C. § 1367 because those claims are related to, and form part of, the same case or controversy the Court has original jurisdiction over for the reasons alleged herein.

8.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

**Facts**

A.  Background

9.     The Maine Credit Union League (the "League") is a nonprofit, professional trade association that exists to serve and represent the interests of Maine's credit unions and affiliated Maine credit union service organizations. The League sponsors MCULIT, which is a tax-exempt employee benefits trust established and maintained for the purposes of providing health coverage and other welfare benefits to the employees (and their families) of the League's members, and which is funded by the contributions of participating credit unions, credit union service organizations, and their employees. MCULIT trustees serve as fiduciaries to MCULIT members and participating employees and their families for the purposes of the benefits provided under the various plans and arrangements maintained thereunder (hereafter referred to collectively as the "Plan").

10.    MCULIT is administered by CU Insurance Solutions ("CUIS"), an insurance agency owned collectively by Maine credit unions and credit union service organizations. CUIS and its employees are responsible for many of the day-to-day operations of MCULIT, including

but not limited to sales & marketing, on-boarding, enrollment, billing, reconciliation, hiring and managing service providers, and other related activities.

11.     Under Maine law, MCULIT is a MEWA, which is defined under 24-A M.R.S.A. § 6601(5) as "an employer welfare benefit plan or any other arrangement that is established or maintained for the purpose of offering or providing health benefits to the employees of 2 or more employers or to their beneficiaries."  Pursuant to Maine's MEWA statute, 24-A M.R.S.A. Ch. 81, MCULIT entered into a consent agreement when it was formed in 2019 with the Maine Bureau of Insurance ("MBOI"). Among other things, the consent agreement requires MCULIT to (a) "maintain a balance of at least three months of annual premium" in reserves at all times and (b) "maintain specific and aggregate excess insurance with an approved insurer with a specific attachment point not to exceed an amount pre-approved by the superintendent."

12.     Anthem is a subsidiary of Elevance Health Inc., f/k/a Anthem, Inc.

13.     Elevance is one of the largest health insurance companies in the United States and in the world.

14.     Anthem is engaged in the business of insurance in the state of Maine.

15.     According to a recent Maine Bureau of Insurance ("MBOI") report, Anthem controlled more than sixty percent (60%) of the large group market for health insurance in Maine and insured over fifty percent (50%) of the total health insurance enrollees in the State.

16.     According to some reports, Elevance represents almost ten percent (10%) of the health insurance market in the United States.

17.     Elevance also is one of the largest stop-loss insurers in the United States. A stop-loss insurer provides risk protection to otherwise self-insured plans to ensure that significantly

3

high claims do not cause financial distress for the Plan, which could, in turn, threaten the Plan's ability to provide benefits to its members.

18.     Anthem functions as a third-party administrator ("TPA") to self-insured plans under so-called administrative services only contracts in which the TPA, among other things, adjudicates, processes, and pays claims, and provides access to provider networks.  Practically speaking, the TPA pays the claims from a claims account funded by the self-insured client; in this case, Anthem was paying claims from a claims account funded by MCULIT. MCULIT, in turn, is entirely funded by contributions from participating credit unions and their employees.

19.     From April 1, 2019 through March 31, 2024 (the "Contract Period"), MCULIT contracted with Anthem to serve (i) as TPA for purposes of administering and paying claims for the health care benefits offered under the Plan and (ii) as MCULIT's stop-loss insurer.

20.     The Administrative Services Agreement ("ASA") between MCULIT and Anthem outlined Anthem's scope and responsibilities as MCULIT's TPA. While the ASA was annually updated through amendments agreed to by the parties, most of the substantive terms and conditions of the ASA have not been altered since 2019. Through those annual amendments, the parties agreed that, unless expressly contracted otherwise through an amendment, the ASA's terms and conditions continued to apply and were in force.

21.     During the Contract Period, MCULIT also contracted with Anthem to provide stop-loss insurance. As with the ASA, the stop-loss policy remained largely the same during the Contract Period, unless expressly amended by the parties.

22.     Anthem's dual role serving as both a TPA and a stop-loss insurer for MCULIT provided Anthem with a unique and advantageous position. On one hand, as MCULIT's TPA, Anthem was responsible for the adjudication, processing, and administration of all claims under

4

the Plan, including high-cost claims. On the other hand, as MCULIT's stop-loss insurer, Anthem was responsible for paying those significantly high claims if they exceeded the pre-determined specific and/or aggregate claim amounts for a respective stop-loss plan year.

23.     As a result of this unique and advantageous position, Anthem possessed the ability to monitor and approve high-cost claims as part of the administrating the Plan as the TPA; and at the same time, as MCULIT's stop-loss insurer, the ability to foresee and forecast the potential applicability of those high-cost claims for purposes of providing stop-loss insurance.

24.     Anthem the stop-loss carrier was privy to inside information about high-cost claimants from Anthem the TPA to which an independent stop-loss carrier would not have had access.

25.     In its capacity as TPA, Anthem had the authority to determine claims for benefits under the Plan as well as the authority to determine appeals of any adverse benefit determinations under the Plan.

26.     Additionally, Anthem contractually agreed to serve as a fiduciary to the extent necessary to perform its obligations and duties as expressed in the ASA as the Plan's TPA.

27.     MCULIT's stop-loss policy with Anthem provided for a "specific attachment point" of $240,000 per individual for the 2022-2023 Plan year. This means that, for any given Member (or dependent), MCULIT was responsible for paying up to $240,000, with Anthem covering the excess over $240,000 for that period.

28.     With respect to the individual who incurred the Claim (defined below) at issue in this litigation, this limit had already been hit earlier in the year (November 2022), which made Anthem fully responsible for the cost of the Claim.

29.     Under the stop-loss policy, if a claim was received, adjudicated, and paid by Anthem in a Plan year, it counted towards the specific stop-loss limit for that applicable Plan year.

30.     The 2022-2023 Plan year ended March 31, 2023. As such, for a claim to be covered under MCULIT's stop-loss policy it had to be received, adjudicated, and paid prior to March 31, 2023.

31.     Per industry norms and standards, once a standard claim is received, the process for adjudicating and paying a claim with prior authorization typically takes one (1) to three (3) business days. High claims are generally subject to one high-claim review for issues such as accuracy and network discounts and, as a result, can take longer to process.

32.     With respect to self-insured plans, like MCULIT's Plan, TPAs will normally—consistent with their fiduciary duties to their clients' plans—prioritize and pay claims at the stop-loss policy year end to ensure stop-loss insurance payment after the specific attachment point has been met. In those cases, the TPA may indicate that the payment is still subject to further review and auditing after the payment is made.

B.   The Claim—Anthem's Slow-Walk

33.     On August 15, 2022, a MCULIT member applied for prior authorization for an Allogenic Stem Cell transplant procedure (the "Claim").

34.     An Allogenic Stem Cell transplant involves the transfer of one person's stem cells to another person, often for purposes of blood cancer treatment.

35.     Anthem did not inform MCULIT that the member had submitted a request for prior authorization. Similarly, when Anthem approved the prior authorization on December 30, 2022 (over four (4) months later), Anthem did not inform MCULIT of the approval. MCULIT was only

generally aware that a member had cancer and that the member may, at some point in the future, be a candidate for a stem cell transplant.

36.     Prior authorization is an insurance industry practice used by insurance companies to control and limit medical costs whereby an insured cannot even schedule a medical procedure absent receiving prior authorization for the medical procedure. As a result, when a medical procedure is granted prior authorization, the plan administrator or TPA is aware that a claim pursuant to that prior authorization is likely to be submitted shortly thereafter.

37.     The costs for an Allogenic Stem Cell transplant are extremely high; in fact, it is one of the highest-cost medical procedures commonly used to treat different forms of blood cancer.

38.     Due to its familiarity with various medical procedures and treatments as both a health insurance company and TPA, Anthem was aware that the Claim carried a high financial cost. Similarly, because Anthem also commonly serves as a stop-loss insurer for self-insured plans, Anthem was aware that the Claim could result in a large financial loss to Anthem as MCULIT's stop-loss insurer if that Claim were above MCULIT's stop-loss policy limits for the 2022-2023 stop-loss policy year.

39.     In the regular course of plan administration, MCULIT only had access to information pertaining to claims that had already been paid.  As a result, Anthem's wrongful mischaracterization of the Claim and withholding of information related to the Claim resulted in MCULIT remaining unaware of the Claim until after it was paid.

40.     The transplant member was admitted to the hospital in Massachusetts on January 17, 2023 and discharged on February 25, 2023. Anthem did not at any time during this period inform MCULIT of the member's admission or the impending submission to the Plan for payment of this exceptionally large Claim.

41.     Blue Cross and Blue Shield of Massachusetts ("BCBS") received the Claim on March 2, 2023, of which Anthem was aware. The Claim was processed in BCBS's system as a claim exceeding one million dollars ($1,000,000). Of that amount, roughly $900,000 was the approximate amount Anthem would have to cover under MCULIT's 2022-2023's stop-loss policy.

42.     The next day, March 3, 2023, BCBS preliminarily denied the claim and requested an itemized bill for a high-dollar prepayment review. The hospital provided that itemized bill to BCBS on March 14, 2023.

43.     On March 15, 2023, BCBS submitted the Claim to Anthem for underlined final processing. That date, March 15, 2023, was more than two (2) weeks prior to the end of 2022-2023 stop-loss year and was approximately seven (7) months *after* Anthem had received the patient's request for prior authorization. Still, Anthem did not inform MCULIT of the Claim.

44.     Despite having the prior authorization, despite being aware of the Claim since August 15, 2022, and despite receiving the claim for final processing on March 15, 2023, Anthem took no substantive action with respect to the Claim until March 31, 2023, which was conveniently the last date of the 2022-2023 stop-loss policy year.

45.     When later asked by an independent, third-party auditor (hired and agreed to by both MCULIT and Anthem to provide an independent audit report (the "Audit Report")) why it took no substantive action during this two-week period, Anthem provided no explanation.

46.     As of March 31, 2023, Anthem's records showed that it had reviewed the Claim and determined that the charges and pricing of the Claim were correct. As a result, Anthem could have paid the Claim on March 31, 2023, but decided not to.

47.     According to the independent, third-party auditor tasked with assessing whether there was any impropriety regarding Anthem's actions in processing the Claim, when asked to

provide information or a rationale for this delay in paying the Claim, Anthem "provided no additional information or valid rationale . . . to support the delay observed in the documentation."

48.     According to the independent Audit Report, once Anthem received the Claim in mid-March, there was *no human activity* with respect to the Claim until March 31, 2023. The Audit Report noted only that on March 22, there was a small edit to a date but nothing else.

49.     The complete lack of action on a one-million-dollar ($1,000,000) claim for two (2) weeks that was previously authorized and submitted for final processing is highly unusual and contrary to a TPA's typical processing cycle.

50.     On April 16, 2023, more than eight (8) months after the member requested prior authorization, more than four and a half (4.5) months after granting prior authorization, and more than forty-five (45) days after receiving the Claim, Anthem paid the Claim.

51.     MCULIT's stop-loss renewal policy for 2023-2024 took effect on April 1, 2023.

52.     Per the independent Audit Report, Anthem's records again show *no activity* on the Claim between March 31, 2023 and April 16, 2023. When probed by the independent auditor for why this occurred, Anthem stated it was conducting a "high dollar audit review," a response the independent auditor concluded was <u>neither</u> customary industry practice nor necessary to subject the Claim to a high dollar review given the prior authorization, the previous high claim review conducted by BCBS, and detailed billing received for the Claim.  The independent auditor determined Anthem's rationale was not credible given its own documentation and prior actions.

53.     Anthem purposefully delayed the processing of the Claim, despite already authorizing it months prior, because Anthem was aware as MCULIT's stop-loss insurer that it was going to be liable for almost one million dollars ($1,000,000) under the stop-loss policy.

54.     Anthem never informed MCULIT that the medical procedure underlying the Claim happened until *after* the Claim was paid approximately forty-five (45) days after Anthem had received it.

C.  Anthem Delays Processing of Pre-Approved Claim While Simultaneously Negotiating New Stop-Loss Policy to Negate Approval of Claim

55.     At the same time the Claim was being submitted and processed, MCULIT and Anthem were in the midst of discussing the renewal of MCULIT's stop-loss policy for the 2023-2024 Plan year.

56.     In the ordinary course of business, a self-insured health plan—even a relatively large plan like MCULIT—will receive limited information regarding the individual claimants in its Plan. Typically, it will receive high claims reports on a monthly or quarterly basis that provide a diagnosis and costs compared to the attachment point for each high claimant. The Plan will not receive information identifying the claimant, or specifics of their treatment or prognosis. Upon request, additional information about whether a claimant is expected to remain a high claimant is available.

57.     In January 2023, Anthem proposed a "laser" provision as part of its proposed 2023-2024 stop-loss policy. A "laser" for purposes of stop-loss coverage is an increase in the specific stop-loss attachment point related to an insured that is incurring or is expected to incur high claim amounts during the year of coverage. Essentially, a laser provision allows an insurer like Anthem to provide less coverage and, therefore, save money, on the basis that an insured, like MCULIT, is incurring or is expected to incur high claim amounts during the year of coverage.

58.     Specifically, on January 9, 2023, ten (10) days *after* Anthem had already provided prior authorization for the Claim, Anthem and MCULIT held a meeting regarding renewal of MCULIT's stop-loss insurance for the 2023-2024 plan year.

59.     The meeting was attended by Liz Stevens and Pam Huntington of CUIS, Patty Cobb from Anthem, Scott Colford, MCULIT's insurance broker, and Stu Rubenstein, MCULIT's actuary.

60.     During that meeting, Anthem proposed a $900,000 laser for the Claim based on the *possibility* that the Claim could occur (*i.e.*, that a Trust member had a diagnosis of leukemia). Anthem represented to MCULIT that the proposed laser was based on a hypothetical despite knowing that the Claim was <u>in fact</u> occurring. Anthem misrepresented the status of the Claim and the significance of the laser to MCULIT, and as described above, MCULIT had no independent way of knowing the claimant's course of treatment or prognosis.

61.     It is important to note that the issue of *possibility* goes to the heart of an insurance contract. Insurers insure against possibility, against risk; they do not insure against certain liability. Accordingly, a certain liability is not a risk; it is a cost.

62.     By the time Anthem held its second renewal meeting (see below) with MCULIT, the patient was already in the hospital, incurring the Claim. That is, the Claim was a certainty and therefore a known cost. Anthem misrepresented this to MCULIT and instead represented the Claim as being only a possibility. As a result, Anthem lured MCULIT into accepting a known liability without its knowledge, under the guise of an insurance contract.

63.     MCULIT's lack of awareness of the Claim fundamentally changed the nature of the renewal negotiations to Anthem's advantage.

64.     Specifically, a negotiation over a possible high claim involves discussions of risk in the form of premiums—whereby the insured shifts risk onto the insurer in exchange for a premium—and lasers—whereby the insurer shifts risk back onto the insured in exchange for a lower premium.

65.     By contrast, the negotiation over a known liability does not involve discussions of risk, premiums or lasers, but merely discussions of who is going to pay the liability and when.

66.     Had MCULIT known of the liability here, it would have argued in negotiations that Anthem should pay the entire Claim amount. If a reasonable agreement were not reached, MCULIT would have had the option not to renew and to instead select another stop-loss carrier.

67.     Through its conduct, Anthem deprived MCULIT of the ability to negotiate on a level playing field and use the competitive marketplace to its advantage, as was appropriate for the situation.

68.     Anthem had never proposed a laser during other renewal discussions with MCULIT as MCULIT's stop-loss insurer.

69.     In fact, when Anthem first proposed a laser during the January 9, 2023 meeting, several of the individuals from MCULIT had no experience with a laser, despite having more than twenty (20) years of experience in the insurance industry.

70.     MCULIT subsequently emailed Anthem and stated that it did not include any language in the stop-loss policy stating that Anthem could require a laser for a claimant. Anthem responded that, if MCULIT renewed its stop-loss insurance with Anthem, Anthem would provide an amended policy containing such language. Anthem did not provide MCULIT with a draft of the amended stop-loss policy (or amended ASA) until July 12, 2023, over three months _after_ the April 1, 2023 renewal date (_i.e._, the proposed effective date of the amendments). After MCULIT sent marked up drafts of both documents on August 22, 2023, Anthem acknowledged receipt, but did not engage in substantive discussions or negotiations regarding the terms of those agreements. As a result, the terms of the 2023-2024 stop-loss policy and the ASA were never agreed upon by the parties.

71.    MCULIT and Anthem held additional renewal meetings on January 19, 2023, and February 3, 2023.

72.    On February 1, 2023, Anthem informed MCULIT that it would agree to reduce the specific stop-loss premium increase from thirty-five (35%) to twenty-five (25%) if MCULIT agreed to the laser and aggregate stop-loss remaining as the parties had previously discussed.

73.    Kim Daigle, Liz Stevens, and Pam Huntington of MCULIT, Patty Cobb, Jonathan Edwards, Jennifer Weber, Benjamin Johnston, and Jim Mickiewicz from Anthem, Scott Colford, MCULIT's insurance broker, and Stu Rubenstein, MCULIT's actuary, attended the February 3, 2023 meeting. During this meeting, Anthem consistently represented that the laser was predicated on the *possibility* that the Claim could occur. Specifically, Anthem continued to misrepresent the status of the Claim and significance of the laser.

74.    On February 8, 2023, MCULIT provided notice to Anthem that the MCULIT member that employed the individual with the Claim was leaving MCULIT effective April 1, 2023, and asked that Anthem remove the laser provision. Anthem refused and reiterated that it was *possible* for the transplant to happen before April 1 with the Claim being paid after April 1.

75.    Soon after February 8, 2023, Anthem received the Claim. Despite receiving and processing the Claim, not to mention pre-authorizing the claim, Anthem *never changed* its position that the Claim "could" come in after April 1.

76.    MCULIT relied on Anthem's representations that the Claim "could" occur after April 1. MCULIT would not have agreed to the laser provision but-for Anthem's representation that the Claim "could" occur after April 1 because it was MCULIT's understanding that the individual with the Claim would no longer be on the Plan.

77.    On April 1, 2023, the renewal took effect with a $900,000 laser on the Claim.

78.     Anthem paid the Claim on April 16, 2023, less than three (3) weeks after the laser took effect.

79.     This resulted in Anthem's desired outcome. Specifically, Anthem shifted most of the cost of the transplant onto MCULIT.

80.     To be clear, Anthem's conduct in this Section C, and the improper "slow-walk" of the Claim described in Section B above were part of the same strategy, and that was to force MCULIT to pay this cost.

D.  Anthem Unlawfully Debits MCULIT's Account

81.     On May 5, 2023, following weeks of communications with Anthem to attempt to resolve the application of the laser and after Anthem's refusal to cooperate, MCULIT requested that Anthem "comply with all information requests … completely, honestly and transparently." MCULIT further directed Anthem "that no deductions shall be made with respect to [the Claim] until the issue of whether the lasered 2023 deductible was appropriately applied to [the Claim] is resolved."

82.     MCULIT made frequent requests for information and transparency from Anthem regarding its handling of the Claim. In response, Anthem provided delayed and fractional information that did not answer MCULIT's questions.

83.     On June 1, 2023, MCULIT received notice from Anthem that Anthem would be violating MCULIT's May 5 direction by debiting MCULIT's account for $1,591,022.74—representing the lasered Claim of $900,000 as well as other paid claims.

84.     In response, that same day, MCULIT expressly told Anthem again that Anthem should not debit MCULIT's account until the issue relating to the laser had been resolved.

85.     Despite this, Anthem debited MCULIT's account on June 2, 2023. With this action, Anthem caused MCULIT's reserve levels to drop well below statutory requirements for a MEWA, as required in MCULIT's consent agreement with MBOI.

86.     When MCULIT raised this issue with the MBOI, the MBOI initially stated that it had no experience with a laser.

87.     MBOI then represented that, because the laser was not approved by MBOI, the policy with Anthem providing for the laser is void or unenforceable. However, MBOI concluded that because Anthem had already wrongfully debited $1.5 million from MCULIT's account, it could not force Anthem to return the wrongfully debited amount.

E.   Anthem's Inaccurate Calculation of Stop-loss Reimbursement Due MCULIT

88.     In addition to the $240,000 specific attachment point described above, the 2022-2023 stop-loss policy also contained an aggregate attachment point of $7,020,000.  The aggregate portion of a stop-loss policy covers the possibility that claims which taken individually are below the specific attachment point nonetheless in the aggregate exceed the expected amount of claims for plan year by a substantial amount.  In general, the aggregate attachment point is set at 125% of the expected claim amount, and exceeding the aggregate attachment point is rare.  However, when the aggregate attachment point is exceeded, the stop-loss insurer is required to reimburse its client for the excess. This reimbursement is called the "aggregate stop-loss reimbursement."

89.     In addition to its improper handling of the Claim, Anthem also miscalculated the aggregate stop-loss reimbursement due to MCULIT for the 2022-2023 plan year.  Specifically, in preliminary conversations early in 2023, MCULIT's actuary and Anthem's underwriting department had, independent of each other, reached preliminary calculations for stop-loss reimbursement that were almost identical and were about $270,000.

15

90.     On May 10, 2023, however, after the Plan year had ended, Anthem completed a second preliminary calculation, showing a reimbursement of only $99,274 dollars.

91.     At this time, and based on reports and information provided by Anthem, MCULIT's actuary calculated the reimbursement to be $279,721 dollars, which is a difference of almost $200,000 dollars.

92.     Then incredibly, without explanation, on May 30, 2023, Anthem issued its final calculation, which lowered MCULIT's reimbursement again, from $99,274 to $12,868.

93.     Anthem is aware that MCULIT, like all insureds, relies on its reports to be accurate.

94.     MCULIT's actuary has never, in more than twenty (20) years in this industry, seen Anthem submit a revised calculation of the aggregate stop-loss reimbursement amount.

95.     This made the final difference between Anthem and MCULIT's calculations $266,853.

96.     On multiple occasions, MCULIT has requested additional information from Anthem to explain this unprecedented disparity. MCULIT received no such information in response.

97.     Anthem's sudden decrease of the aggregate stop-loss reimbursement to MCULIT by more than a quarter of a million dollars followed MCULIT protesting and raising issues with Anthem's improper handling of the Claim.

98.     Anthem failed to properly calculate MCULIT's aggregate stop-loss reimbursement in contravention of the parties' stop-loss agreement.

F. Independent Third-Party Auditor Confirms that Anthem's Actions in Improperly Slow-
Walking the Claim are Contrary to Past Practices, Industry Norms, and are Unsupported by
Anthem's own Documentation

99.     Under the ASA, MCULIT could request an outside audit if there was a dispute
regarding Anthem's conduct as a TPA of the Plan. Pursuant to the ASA, Anthem must approve
the auditor. The ASA also requires that the auditor be independent and objective.

100.    In late June 2023, Anthem, as it was contractually obligated to do, agreed to
MCULIT's request for an outside, independent audit regarding its administration of the Claim.

101.    With Anthem's approval, MCULIT engaged Claims Technologies Incorporated
("CTI"), a nationally renowned auditor that specializes in conducting audits of self-funded plans.
CTI's objectives included, but were not limited to, assessing whether Anthem was following the
terms of ASA as well as whether Anthem processed and paid the Claim in a timely manner.

102.    In August 2023, CTI began its audit process of Anthem's handling of the Claim.
Through the audit process, CTI reviewed the parties' ASA, the dozens of documents generated as
part of the Claim being submitted to Anthem, and the numerous data points reflected in Anthem's
internal reporting system reflecting Anthem's receipt, ingestion, processing, and payment of the
Claim.

103.    On December 8, 2023, CTI prepared a draft letter of findings and sent it to Anthem
for any comments or clarifications. CTI does this as a regular practice to allow the TPA to provide
additional information or provide its perspective on any of the findings.

104.    On December 21, 2023, Anthem responded to CTI's draft report. In it, Anthem
stated "[t]he below serves as Anthem's response to a portion of CTI's comments but should not
be read as Anthem's response to all of the inaccuracies and/or incorrect conclusions in CTI's draft
report." Anthem only responded to two (2) aspects of CTI's draft report. It did not identify what

other "inaccuracies" or "incorrect conclusions" there were in the draft report despite CTI providing

the draft report for that *exact reason*.

105.    Anthem did not identify any "inaccuracies" or "incorrect conclusions" because

there were no such "inaccuracies" or "incorrect conclusions" in the draft report.

106.    Regarding the two (2) aspects Anthem did address, Anthem merely reiterated the

actions it took with respect to the Claim and asserted that its actions were not improper or out of

the norm. Anthem's assertions were belied by its own internal data and contrary to industry norms

and practices.

107.    In CTI's final audit report, attached as **Exhibit 1**, CTI concluded that given its

review and "that an authorization for this service had been on file for more than 6 months upon

date of disposition, the timeline for [the Claim] payment appears to be excessive."  When asked

by CTI why no action had been taken for more than (2) weeks following the Claim being submitted

for final processing, CTI stated that Anthem "provided no additional information or valid rationale

to CTI to support the delay observed in documentation."

108.    Anthem represented to CTI that "the Elevance Claim Department is a stand-alone

function and is unaware of individual group stop-loss arrangements [and] does not prioritize claims

processing for a group that may be at the end of its stop-loss period."  CTI concluded, "based on

our extensive experience, this is not within industry standards for the processing of claims at stop-

loss year end."  As noted above, the industry standard is for the TPA to prioritize payment of high

claims at year end to ensure stop-loss coverage above the attachment point. CTI stated that action

consistent with industry standards and norms, "would protect both the self-funded client and

ensure that claims were paid in accordance with stop-loss requirements."

**Legal Claims**

**Count I – Breach of Fiduciary Duty as an ERISA Fiduciary – Duty of Loyalty**

109.     MCULIT repeats and realleges herein by reference each and every paragraph that appears above and below.

110.     Pursuant to its duties and discretion as a TPA and/or under the parties' ASA, Anthem was an ERISA fiduciary. As such, Anthem was obligated to comply with ERISA's fiduciary duty obligations.

111.     An ERISA fiduciary's duties have been described as "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

112.     ERISA requires that Anthem's interpretation and implementation of a Plan be "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of …providing benefits to participants and their beneficiaries … and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1).

113.     This duty of loyalty imposed on Anthem prohibits self-dealing and financial arrangements that benefit itself at the expense of MCULIT members.

114.     Anthem breached its duty of loyalty for the reasons alleged herein, which include, but are not necessarily limited to, purposefully delaying and slow-walking its processing and payment of the Claim to benefit itself as MCULIT's stop-loss insurer.

115.     By purposefully delaying and slow-walking its processing and payment of the Claim to benefit itself as MCULIT's stop-loss insurer, Anthem was not acting in the best interests of MCULIT or MCULIT's members, was not acting prudently, and was contravening its duties as an ERISA fiduciary.

116.     Anthem's breach caused harm to MCULIT and its members.

117.    As a direct and proximate cause of Anthem's breach of fiduciary duty, MCULIT and its members have suffered injury and are entitled to all remedies and relief available under ERISA.

**Count II - Breach of Fiduciary Duty as an ERISA Fiduciary – Failure to Act Prudently with ERISA Plan Assets (in the alternative)**

118.    MCULIT repeats and realleges herein by reference each and every paragraph that appears above and below.

119.    Pursuant to its duties and discretion as a TPA and/or under the parties' ASA, Anthem was an ERISA fiduciary and was obligated to comply with ERISA's fiduciary duty obligations, which included Anthem acting "with the care, skill, prudence, and diligence" that a prudent TPA should use in similar circumstances. 29 U.S.C. § 1104(a)(1)(B).

120.    To the degree that Anthem did not purposefully delay and slow-walk its processing and payment of the Claim so as to benefit itself as MCULIT's stop-loss insurer, for the reasons alleged herein, Anthem's actions were negligent and substantially below the care, skill, prudence, and diligence that a prudent TPA should have used in processing and paying the Claim in an efficient and timely fashion.

121.    Anthem's breach caused harm to MCULIT and its members.

122.    As a direct and proximate cause of Anthem's breach of fiduciary duty, MCULIT and its members have suffered injury and are entitled to all remedies and relief available under ERISA.

**Count III – Fraud in the Inducement**

123.    MCULIT repeats and realleges herein by reference each and every paragraph that appears above and below.

124.     During Anthem's processing of the Claim as a TPA, Anthem, as MCULIT's stop-loss insurer, was aware that the Claim had been submitted and was being processed by Anthem.

125.     Anthem proposed a laser for MCULIT's 2023-2024 stop-loss policy on the premise that the Claim could occur during the 2023-2024 stop-loss policy year despite knowing and being aware that the Claim had been submitted and was being processed during the 2022-2023 stop-loss policy year.

126.     Anthem's multiple affirmative representations regarding the possibility of the Claim being submitted during the 2023-2024 stop-loss policy were false and untruthful.

127.     Additionally, Anthem's failure to disclose that the Claim had been submitted and was being processed during the 2022-2023 stop-loss policy year at the same time it proposed a laser for the Claim for purposes of the 2023-2024 stop-loss policy was a material omission.

128.     Anthem's representations regarding the status of the Claim and the potential applicability of the laser were material representations that Anthem understood were untruthful and incomplete.

129.     Anthem's representations regarding the status of the Claim and the potential applicability of the laser were made during the midst of negotiations for the 2023-2024 stop-loss policy to encourage and coax MCULIT into agreeing to the laser for the 2023-2024 stop-loss policy.

130.     MCULIT justifiably relied upon Anthem's representation regarding the potential applicability of the laser and had no reason to believe that Anthem was not being forthright with its representations.

131.     MCULIT's reliance upon Anthem's representation status of the Claim and the potential applicability of the laser caused hundreds of thousands of dollars in damages to MCULIT.

## Count IV – Breach of Duty of Good Faith and Fair Dealing

132.    MCULIT repeats and realleges herein by reference each and every paragraph that appears above and below.

133.    In every insurance contract under Maine law, an insurer has a duty to act in good faith and deal fairly with its insured.

134.    The 2022-2023 and the 2023-2024 stop-loss policies were governed by Maine law.

135.    Anthem, as MCULIT's stop-loss insurer, failed to act in good faith and deal fairly with MCULIT as its insured by falsely representing the status of the Claim and the potential applicability of the laser for purposes of MCULIT's stop-loss insurance to the detriment of MCULIT.

136.    Anthem, as MCULIT's stop-loss insurer, failed to act in good faith and deal fairly with MCULIT by intentionally miscalculating and misrepresenting the amount of the aggregate stop-loss reimbursement.

137.    Anthem's violations of its duty of good faith and fair dealing caused MCULIT damages.

## Count V- Breach of Contract

138.    MCULIT repeats and realleges herein by reference each and every paragraph that appears above and below.

139.    MCULIT's 2022-2023 stop-loss policy specified an aggregate stop-loss formula for purposes of determining the aggregate stop-loss amount for that plan year.

140.    Independent of the amount owed to MCULIT for purposes of the Claim, Anthem wrongfully calculated the amount owed MCULIT according to the aggregate stop-loss formula and the data provided by Anthem itself.

141.    MCULIT demonstrated to Anthem that Anthem had wrongfully calculated the amount owed to MCULIT and made multiple requests to Anthem for additional information to understand how it arrived at its reimbursement figure, despite Anthem's own data and formula showing its reimbursement figure was incorrect. Despite those efforts, Anthem did not change its position on the aggregate stop-loss amount owed to MCULIT for the 2022-2023 stop-loss policy year.

142.    Anthem failed to follow the 2022-2023 stop-loss policy year's aggregate stop-loss formula and failed to properly calculate the amount owed to MCULIT under the aggregate stop-loss formula in violation of the 2022-2023 stop-loss policy.

143.    Anthem's breach of the 2022-2023 stop-loss policy has caused MCULIT hundreds of thousands of dollars in damages and Anthem has refused to pay MCULIT the amount MCULIT is rightfully owed under the 2022-2023 stop-loss policy.

## Count VI – Breach of Contract

144.    MCULIT repeats and realleges herein by reference each and every paragraph that appears above and below.

145.    Pursuant to the parties' original, governing stop-loss policy, the stop-loss policy renews if Anthem provides MCULIT with the terms and conditions of the proposed renewal within sixty (60) days prior to the end of the applicable policy period.

146.    For the 2023-2024 stop-loss policy, Anthem did not provide MCULIT with a draft of the amended stop-loss policy until July 12, 2023, over three months after the April 1, 2023 renewal date (i.e., the proposed effective date of the amendments). In addition, for previous stop-loss policy years, Anthem also had not provided MCULIT with the amended stop-loss policy proposal within the requisite time frame.

147.    Despite that, through the parties' course of dealing, the parties operated under the understanding that Anthem was still providing MCULIT stop-loss insurance in accordance with the preceding stop-loss policy year contract until the parties were able to agree to any proposed modifications or additions to the stop-loss policy for the new stop-loss policy year.

148.    After MCULIT sent marked up drafts of the 2023-2024 stop-loss policy on August 22, 2023, Anthem acknowledged receipt, but did not engage in substantive discussions or negotiations regarding the terms of those agreements. Accordingly, the parties never agreed to a contract for the 2023-2024 stop-loss policy.

149.    After April 1, 2023, Anthem acted as MCULIT's stop-loss insurer and MCULIT understood Anthem was acting as its stop-loss insurer pursuant to the 2022-2023 stop-loss policy's terms and conditions.

150.    Despite MCULIT never agreeing to the 2023-2024 stop-loss policy, and despite the parties' understanding that the 2022-2023 stop-loss policy was still in effect, Anthem exercised the laser with no authority to do so and in violation of the stop-loss policy in effect at the time.

151.    Indeed, according to the MBOI, because the laser was not approved by MBOI, the policy with Anthem providing for the laser was void or unenforceable.

152.    Through Anthem's exercise of the laser in violation the 2022-2023 stop-loss policy, MCULIT suffered damages.

### Count VII - Unjust Enrichment (in the alternative)

153.    MCULIT repeats and realleges herein by reference each and every paragraph that appears above and below.

154.    To the extent there was no enforceable stop-loss contract for the 2023-2024 policy year, Anthem as MCULIT's stop-loss insurer received a benefit via its application of the laser to

the Claim that conferred a benefit to Anthem of almost one million dollars that Anthem was not entitled to as a matter of equity.

155.     During its conduct through negotiating the 2023-2024 stop-loss policy and its awareness of the circumstances and status of the Claim, Anthem was aware that application of the laser to the Claim would result in a benefit to Anthem which is it was not entitled to.

156.     MCULIT has demanded that Anthem return the benefit it wrongfully received to MCULIT, but Anthem has refused.

157.     Anthem's retention of the amount it received through its application of the laser to the Claim is inequitable and unjust for the reasons alleged herein.

### Count VIII – Conversion

158.     MCULIT repeats and realleges herein by reference each and every paragraph that appears above and below.

159.     MCULIT made multiple requests for Anthem to not deduct any amount from MCULIT's claims account given Anthem's wrongful handling of the Claim and inaccurate calculations of the amount owed MCULIT according to aggregate stop-loss formula.

160.     MCULIT's monies in its bank account are MCULIT's property, of which Anthem had no valid, enforceable interest in.

161.     Despite those multiple demands, Anthem nevertheless wrongfully obtained nearly $1 million dollars from MCULIT's account to which Anthem had no right.

### Prayer for Relief

WHEREFORE, Plaintiff the Board of Trustees of the Maine Credit Union League Insurance Trust respectfully requests that the Court enter a Judgment against Defendant Anthem

Health Plans of Maine, Inc., d/b/a Anthem Blue Cross & Blue Shield, and requests that this Honorable Court:

a) Award Plaintiff damages in an amount to be determined at trial, plus interest, costs and fees;

b) Award Plaintiff remedies in the amount available by law and in equity;

c) Award Plaintiff its reasonable attorneys' fees and costs incurred in pursuing this litigation; and

d) Award Plaintiff such other and further relief as this Court shall determine to be just and proper.

Dated: November 4, 2024

*/s/ Shiloh D. Theberge*
*/s/ William J. Wahrer*
Shiloh D. Theberge, Esq.
William J. Wahrer, Esq.

Attorneys for Plaintiff
BERNSTEIN SHUR
100 Middle Street, P.O. Box 5029
Portland, ME  04104
(207) 774-1200
stheberge@bernsteinshur.com
wwahrer@bernsteinshur.com